## Brashear v. Commonwealth.

(Decided December 21, 1917.)

### Appeal from Warren Circuit Court.

1. Criminal Law—Evidence.—A general rule is, that when an accused is put upon trial for one offense, he is to suffer conviction, if at all, by evidence, which shows that he is guilty of that offense, alone.

2. Criminal Law—Other Offenses—Trial—Evidence.—The proof against one upon trial for a crime, of independent, distinct and unconnected offenses from the one being tried, is, in nearly all cases, prejudicial, and the exceptions to the rule are, where the accused has committed several criminal acts, which are so connected with regard to time and place, as to form one transaction, and without proof of them all, it is impossible to present the evidence of his guilt of the one under trial; or when the accused substantially admits the act charged, but seeks to avoid its consequences by a claim of a lack of guilty knowledge or intent, then other criminal acts, similar to that of which he is accused, is admitted to show guilty knowledge or intent; or where the proof tends to show, that the accused has committed another crime to enable him to commit or conceal the one for which he is being tried; or when a crime is committed by novel means, or in a particular manner, it may be shown; that the accused has committed other distinct offenses, in the same manner, for the purpose of identifying him as the perpetrator of the one for which he is being tried.

MAX B. HARLIN, CHARLES DRAKE and G. B. McINTYRE for appellant.

CHARLES H. MORRIS, Attorney General, OVERTON S. HOGAN, Assistant Attorney General, and JOHN H. GILLIAM for appellee.

OPINION OF THE COURT BY JUDGE HURT—Reversing.

The appellant, Harry Brashear, was tried and suffered a conviction, in the Warren circuit court, for the crime of wilful murder, and his punishment was fixed at imprisonment for life, by a judgment of the court, in accordance with the verdict of the jury. His motion for a new trial having been overruled, he seeks a reversal of the judgment, by appeal to this court. The two grounds, urged by his counsel, for reversal of the judgment are: (1) The admission, over his objection, of incompetent evidence, which was prejudicial to his substantial rights; (2) important evidence discovered by him after the trial, of which he did not know, at the time of the trial, and of which he, with reasonable diligence, could not have learned and produced at the trial, in his behalf.

The victim of the homicide, of which he was convicted, was Maggie Cherry, a young woman about twenty-seven or twenty-eight years of age, and a resident of the city of Bowling Green. The murder was, peculiarly, an atrocious one. Maggie Cherry had been married, but, a year or more before her death, she and her husband had separated and he was residing in a distant city, at the time of her murder. The appellant was a young man, twenty-eight years of age, and a native of New Albany, Indiana; a marble cutter by occupation, and very much given to the use of alcoholic beverages. Some time, in the fall of 1916, he came to Bowling Green to work in the marble works of one Clarence Runner, and, while, he was thereafter absent for certain periods of time from the city, he continued chiefly in the employment of Runner, until the murder occurred, for which he was convicted. Shortly after he came to Bowling Green, he became acquainted with Maggie Cherry, who then kept a small restaurant in the city, and by the end of the year, he and Maggie appeared to have become lovers, as a number of letters, which he wrote to her from New Albany, about the first of the year, were read, in the evidence, and they abounded with many endearing terms, which he bestowed upon her. In one or more of them, he addressed her as his wife. The letters, also, showed, that he had been borrowing money from her, and, in one of them, he made the inquiry, if when he returned to Bowling Green, she would furnish him money for transportation. He seems to have returned to Bowling Green, in February or March, 1917, and, in the meantime, Maggie Cherry had

closed her restaurant and was employed by one Mr.
Hester, who conducted a hotel, to attend to the dining
room. Very nearly every evening, when supper had been
served at the hotel, she would go to the home of her
mother, who resided nearby, and the appellant, Brashear,
would join her there, and when she would return to the
hotel about 9:30 or 10 o'clock in the evening, he would
accompany her to the hotel. He was in her company each
evening after nightfall with few exceptions, for some
time preceding her murder, and it was proven on the
trial, that he had stated, at the time of her disappearance,
that he could not remember of any night, when he was
not in her company, except the one, upon which she disap-
peared and was murdered. She was killed upon Thurs-
day night, the 21st day of June, but, he stated upon the
trial, that he did not see her upon that night, but was
with her on the evenings of Sunday, Monday and Wed-
nesday, preceding, but did not see her on the Tuesday
evening preceding. Some time before her death, her
friends and family came to recognize, that, she and ap-
pellant were intending to marry, and he said upon the
trial, that they were engaged to be married, but the
time for the nuptials had not been agreed upon. She
brought a suit and obtained a divorce from her husband
about ten days before her death. About 5 o'clock, on
Thursday evening, June 21st, the appellant was seen
talking with her at the hotel, where she worked. After
supper had been served, and at about half after 7 o'clock,
she prepared to go out and said to the other servants,
that she had a "date" for the evening, and left the hotel.
She did not go to her mother's home, as she had been ac-
customed to do, and was not there on Wednesday
evening, preceding, though upon Thursday evening, after
she had left the hotel, she was seen going in the direc-
tion of her mother's home. The appellant, near to this
time, was seen upon the street and about 8 o'clock passed
along the street, in front of her mother's home, and was
probably seen in that vicinity another time on that even-
ing. The whereabouts of Maggie Cherry, from the time
she left the Hester Hotel, until nearly 11 o'clock, was
not accounted for. Between 10 and 11 o'clock, Morris
Greenberg and Eli Shapiro saw her and appellant near
the Mansard Hotel, where they turned into and went out
Center street. She did not return to her room, at the
hotel, on that night, and on the next morning, the pro-
prietor began an investigation to learn the cause of her

absence. He went to her mother's home, and it was suggested, there, that probably she and appellant had gone away to get married. He then went to the marble shop, where appellant worked, and finding him there, inquired of him if he and Maggie had married, and having received a denial, stated that she had not returned to the hotel the evening before, and appellant stated, that he had not seen her for the two nights preceding. Appellant then went to the home of her mother, and in a conversation, which followed, suggested, that probably she had gone to Louisville, and that he would meet the incoming trains on that night. On the same morning, persons, passing over the bridge across Barren river, which is nearly or quite two miles from the court house, in Bowling Green, discovered drops of blood on the end of the bridge, opposite the city. These blood drops continued along the floor of the bridge to near its middle, where the wire fence, on the side, was crushed down, somewhat, and there blood stains were upon each side of the wire fence, on the floor of the bridge. That night the appellant was about the depot, until the midnight train from Louisville arrived, when he remarked to the policeman, that she had not come on the train, and that he was going home. On the following Monday morning her body was discovered, in the Barren river, about forty or fifty yards below the bridge, with a stone, which weighed seventy-six pounds, attached to it by a rope, which was tied around her neck. The knot, by which the rope was attached to the stone, was of such an intricate character, that no one could describe it, in the evidence. It was shown by appellant, that he knew how to attach ropes to heavy stones for the purpose of moving them. A gun shot wound was in the side of her head. It entered beneath the ear and came out over or near the temple. She was fully dressed, except her shoes, and one stocking had been removed. There was some evidence to the effect, that she sometimes carried her money in her stocking. Clarence Runner informed appellant of the discovery of her body, shortly, after it was found, when he went to the home of Maggie's mother, and in a conversation there, inquired, if she thought, that he had killed Maggie. He, also, told the mother that Maggie had fifty dollars, in gold, and a small roll of paper money, and where she kept the money in a certain drawer, but, upon examination, it was not found, at that place nor at any other. Upon that evening, he returned to the home

of the mother, accompanied by one Otis Isbell, who stated, that on the night of Maggie's disappearance, appellant was in the park, and, probably, at a moving picture show. On this occasion, appellant inquired, if it had been learned, what was the size of the bullet, with which Maggie had been killed, and when informed, that it was a No. 32, he apparently evinced considerable nervousness, and busied himself with wiping away the perspiration from his face and arms, though at this time, he was considerably under the influence of liquors. He, also, inquired of Maggie's sister, what she would state, if called on about the matter. Upon investigation, it was found that the stone, which was attached to the murdered woman's neck, had been procured near the road, about nine-tenths of a mile from the bridge, upon the opposite side of the river from the city, and at a "tie yard."

The appellant denied, that he was, in anywise, guilty of the murder, or had any knowledge of it, and stated that he did not see the victim of the homicide upon the night of her disappearance or during the day previous thereto, and that he was in various places in the city on Thursday night, among them being the park and a moving picture show, and retired to his own room at 10 o'clock in the evening, where he remained, until the following morning. These statements, of his, were, more or less, corroborated by a number of witnesses, by an exactness more or less convincing—only one or two of the witnesses being able to remember, that it was on Thursday evening, that he was seen at the places mentioned by him. The keeper of a grocery testified, that about 9 o'clock, on Thursday night, Maggie Cherry, accompanied by a tall, thin young man, named George Bewley, was in his store, and a party, working at a livery stable, testified, that on the same evening a tall, thin, young man wanted to engage a horse and buggy to be kept by him until 2 o'clock, on that night, but he refused to let him have them. Another party, who worked at the same stable, testified that George Bewley, a tall, thin young man, hired a horse and buggy one night that week, and did not return with them until about 12 o'clock, but that it was not Thursday night, but was Monday, Tuesday or Friday night. It was proven by persons living on the road beyond the "tie yard," that about one week before Thursday, June 21st, Maggie Cherry and a tall, thin young man were driving, on that road, in a buggy, and that she had, shortly theretofore, been on the same

road in a buggy, accompanied by the same tall, thin young man, on two other occasions, and that on the evening she was murdered, a pistol shot was heard in the neighborhood of 9 o'clock, on the road near the "tie yard."

The foregoing is a statement of a sufficiency of the facts to make clear the reasons for the opinion at which we have arrived.

(a)   The newly discovered evidence, which was relied upon for a new trial, was as follows:

Upon the trial, Morris Greenberg could not fix the time, when he and Shapiro saw appellant and Maggie Cherry, together, on Center street, between 10 and 11 o'clock, as being on Thursday night, the night upon which the murder occurred, but stated that it was the same evening upon which Shapiro passed his store, and said that he had been in the country that day, and which Shapiro stated was Thursday night, June 21st, and fortified his recollection, by the fact, that it was upon the night following the day upon which he gave a check to a man named Pillow, for a load of old iron, and the check bore the date of June 21st, and he further fortified his recollection by the circumstance, that an acquaintance of his, by the name of Lorch, was in the city upon that night, and that he accompanied him to near the depot, when Lorch took his departure for Louisville. After the trial, an affidavit was procured from Lorch, in which he stated, that it was the night of Friday, June 22nd, that he was in Bowling Green, and not Thursday, June 21st, and Shapiro, also, made an affidavit, to the effect, that he was mistaken, when he stated, that the night, upon which he saw appellant and Maggie Cherry, together was the same night, upon which he was in company with Lorch. These affidavits were filed with the motion for a new trial.

(b)   The incompetent and prejudicial evidence complained of was as follows: When the appellant was testifying as a witness in his own behalf, upon his cross-examination, the Commonwealth's attorney was permitted to ask him, over his objection, and he was required to answer the following questions:

"Q. You say you have been married twice? A. Yes, sir.   Q. When was it that you first married? A. In 1908. Q. To whom?   A. Lida Bohannon.   Q. Where?   A. In New Albany.   Q. How long did you live with her?   A. Six or eight months.   Q. Were you divorced?   A. Yes, sir, she got a divorce from me.   Q. What were the

grounds? A. I don't know what they were, drinking or something. Q. Wasting your estate and failing to provide? (Witness does not answer.) Q. Did you have any children? A. Yes, sir. Q. Boy or girl? A. One girl. Q. When was it, how long after you were married? A. We were married in September, and the baby was born on Christmas morning. Q. How long was it until you married again? A. It was in 1911, July 3rd. Q. How long did you live with your last wife? A. Three years. Q. Who procured the divorce, you or your wife? A. She did. Q. What were the grounds for divorce? A. If I had fought the case I could have beat her, but I was glad she got the divorce. Q. Have any children? A. A little boy. Q. How long after you married the last time, until the little boy was born? A. Not long, we were married in July and the baby was born in September. Q. Away long in the fall? A. Yes, sir. Q. That was in 1911. What time did you come to Bowling Green? A. I have been here a year in September. Q. During your marriage relations with either of these women did you have any trouble with them? A. I say I did. Q. Were you arrested for assaulting your wife? A. The last one, I was. Q. You paid a fine for assault and battery? A. I smacked her in the face. Q. Have you separated from her? A. Yes, sir. Q. And you were fined for that? A. Yes, sir, $18.80.''

It will thus be observed, that, although the only issue, in this case, was, whether the appellant was guilty of the crime of murder, by killing Maggie Cherry, he was asked and required to give answers, which showed, that he had been guilty of seduction, in two instances, or at least of the offense of fornication, under circumstances of bestiality from which seduction could be inferred, and had, also, been guilty of an assault and battery upon one of his wives, from whom he had afterwards been divorced, and had been tried and convicted and punished for such offense. The offenses did not and could not have any connection with the crime, with which he was accused and for which he was being tried. The general rule is, that when an accused is put upon trial for one offense, he is to suffer conviction, if at all, by evidence, which shows that he is guilty of that offense, alone. Very obvious reasons exist for the support of the soundness of this rule. If permitted to prove that a defendant has been guilty of other crimes, in no way connected with the one for which he is being tried, conviction would be

had upon a particular charge, by combining with the evidence of it, the evidence of other crimes, when the evidence of the particular charge would be probably insufficient for a conviction, as it is apparent, that it is easier to believe one to be guilty of a crime, when proof is made that he has committed another offense similar to the one of which he is accused, or as to that matter of any crime or offense, when logically, the guilt of one offense does not prove guilt of another. The proof of guilt of another and distinct offense has a tendency to prejudice the minds of the triers against the accused and to predispose them to a belief in his guilt, when logically, it does not have that effect. The proof of the guilt of an offense, not connected with the one for which the accused is being tried, finds the accused unprepared to meet it with evidence, and further, leads away the mind from the very issue to be determined. The proof of a distinct offense from the one under trial is not permissible, except when the accused has committed several criminal acts, which are so connected in regard to time and place, as to form one transaction, and without proof of them all, it is impossible to present the evidence of the guilt of the offense under trial; or when the accused substantially admits the act charged, but seeks to avoid its consequences by a claim of lack of guilty knowledge or intent to commit the act, the proof, of other criminal acts, similar to that of which he is accused, may be admitted to show his guilty knowledge or intent; or where the proof tends to show, that the accused has committed another crime to enable him to commit or conceal the one, for which he is being tried; or when a crime is committed by novel means or in a particular manner, the proof of other distinct crimes may be admitted for the purpose of identifying the accused as the perpetrator of the crime, by showing that he has committed other distinct offenses in the same manner. 10 R. C. L. 198, 199, 200, 201; Raymond v. Com., 123 Ky. 168; Barnes v. Com., 101 Ky. 556; Bexx v. Com., 116 Ky. 349; O'Brien v. Com., 115 Ky. 608; Snapp v. Com., 82 Ky. 173; Clark v. Com., 111 Ky. 443; Morse v. Com., 129 Ky. 249. It is apparent, that the proof of the acts of seduction, fornication and assault and battery upon a woman, developed, by the evidence complained of, do not fall within either of the exceptions above stated. They are entirely disconnected, distinct offenses from the one under trial; they do not show any motive for the commission of the crime charged, and neither were or

could be committed in the manner of the crime under trial; they were not committed for the purpose of enabling the accused to commit the offense under trial, or to enable him to conceal it. From analagous reasons, the bad character of the accused cannot be proven, as evidence, of his guilt of a particular crime, and neither can it be shown, that an accused is such a bad character, that he would be likely to commit the offense, of which he is accused, as evidence of his guilt, by proving independent, distinct and disconnected offenses of which he has been guilty, for after all, he could be guilty of previous criminal acts, and yet not be guilty of the one, for which he is being tried. As above stated, it is no doubt easier, to believe that a man of bad character or one who has been guilty of a criminal act, to be guilty of a crime, for which he is undergoing trial, and doubtless, for that reason, to avoid the doing of injustice, an unbroken line of adjudications of this court, as well as those of others, have denied the right to convict an accused of a crime, by evidence of his bad character, or evidence proving his guilt of crimes, wholly distinct, unconnected and independent of the crime for which he is undergoing trial, and the introduction of such evidence, either through witnesses, or the enforced testimony of the accused, while undergoing cross-examination, as a witness for himself, has been held to be prejudicial to his substantial rights, in nearly all cases. Shepherd v. Com., 119 Ky. 93; Combs v. Com., 14 R. 703, 21 S. W. 353; Cargil v. Com., 13 S. W. 916; Spurlock v. Com., 14 R. 605; Howard v. Com., 110 Ky. 356; Seaborn v. Com., 25 R. 2203, 80 S. W. 223; Hensley v. Com., 25 R. 48, 74 S. W. 677.

The fact, that counsel for appellant inquired of him upon his direct examination, if he had been married and divorced, and he so stated, did not justify the inquiries made upon cross-examination, and the answers he was required to make. The direct examination only showed, that he had been twice married and divorced before his acquaintance with the deceased, and it was not improper for him to show that he was an unmarried man and eligible for marriage to the deceased. The evidence offered of his guilt was the proof of a number of circumstances, and inferences, only, and it is apparent that the proof of other offences, with penalties, of which he had been guilty, was greatly prejudicial to his substantial rights, and makes necessary a reversal of the judgment. If guilty, there can be no doubt, that the severest punish-

ment should be inflicted upon him, but his guilt must be first determined by a fair trial. Hence, it will be unnecessary to pass upon the merits of his application for a new trial, upon the ground of newly discovered evidence, and no other questions, in the case, are now determined.

It is therefore ordered, that the judgment be reversed and the cause remanded for a new trial consistent with this opinion.