## Steele v. Commonwealth.

(Decided Feb. 9, 1934.)

BAILEY P. WOOTTON, Attorney General, and WILLIAM R. ATTKISSON, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Reversing.

On May 12, 1931, Lena Steele, aged 37, and Walter Steele, aged 21, were married, and on Tuesday, December 23, 1931, she slew him. She was indicted for murder, upon her trial, had April 18, 1932, was con-

victed of. manslaughter, her punishment was fixed at 5 years in the penitentiary, and she has appealed.

She admits the killing, and insists she had it to do in order to save her own life. We· will say as little as possible of the evidence, as it is unnecessary, in view of the conclusion to which we have come. This homicide occurred in the home of Mr. and Mrs. Steele, and there was no one there but the two; hence her conviction or acquittal must entirely depend upon the credence given to her testimony by the jury. The commonwealth's attorney in the opening statement told the jury that it would be shown that the appellant referred to her husband as a "son of a bitch," and this was her favorite word. It failed to prove that. What consideration would an ordinary man have for the oath of a woman said to have referred to her husband as a "son of a bitch" and to have used the word "son of a bitch" as her favorite word?

The appellant testified. Immediately the commonwealth's attorney, over her objection, delved into her matrimonial ventures, showing her numerous marriages, six in all. It must be admitted that the average reasonable man looks with considerable suspicion upon one indulging in an unusual number of marriages thinking that something must be wrong or she would not have had so many husbands. This, standing alone, perhaps, would not be so material, but for the fact in the next breath we find the commonwealth's attorney asking the appellant "if she lived with Walter Steele before she married him," and if "Walter Steele's mother did not protest so vehemently against her living with her son that she married him." Not being satisfied with asking these questions, the commonwealth's attorney goes further, asking her "how long she had been closely associated with Steele before she married him, either in business or in morals." In addition to this, the commonwealth's attorney ·by insinuations continued to attack her moral character by inquiring of the witness Robert Lewis, who had testified for her, "how frequently he had visited Mrs. Steele in the absence of her husband." Upon the witness replying, "I don't know that I was ever there when her husband wasn't there," the commonwealth's attorney asks, "Are you sure about that?" And, upon the witness replying, "I am sure; I am not in the habit of visiting men's wives when they

are not there," the commonwealth's attorney says, "I imagine your conduct is excellent." The effect and purpose of such insinuations is inescapable. Considering these questions together, the appellant is very effectively branded in the eyes of the jury as a woman of ill fame.

The average jury has little conception of what evidence is or is not competent; but they have reason to suppose that in the cross-examination of a witness the commonwealth's attorney in conducting the cross-examination only asks a question of such a character when he has information that the matter to which the inquiry pertains is a fact. Even the objection by counsel for the accused to questions of such a nature gives the jurors the impression that the accused is unwilling to let all the facts be brought out, and results in the deduction by the jury that the matter inquired about must be true or the accused would have no objection to answering the question. That the credibility of a woman of lewd character is impaired we all know. Undoubtedly from these improper questions the jury was led to believe that the appellant was a woman of loose morals. This, of course, impaired her credibility as a witness.

The commonwealth was not satisfied by innuendo to brand her as unchaste, for we find the commonwealth's attorney next asking her "if before she married Walter Steele she had not sent her still up to the house of his mother to conceal it and prevent its capture." Before she could answer this question, the lower court sustained an objection to it and admonished the jury. But, in view of the questions which had been asked up to the time this question was asked, did the admonition of the court remove the damage done? He had by innuendo just branded her as being unchaste, and now by the same means he branded her as a manufacturer of illicit liquor—a bootlegger.

The effort of the commonwealth by sarcasm and innuendo to brand her as being a "bootlegger" does not cease with this. During the cross-examination of appellant's mother, she was asked if she was the proprietress of "Blue Heaven." Upon the witness answering, "I think I am ready for Blue Heaven whenever He calls me," the commonwealth's attorney then said: "The Blue Heaven I am talking about is a bootlegging

and secondhand fortune-telling joint up where you live.'' From this sarcasm and innuendo the jury was given the impression that the appellant and her family were involved in the illicit liquor traffic.

Even in his closing argument to the jury we find the commonwealth's attorney sarcastically referring to ''this woman with a telephone and an automobile''; it being generally known that bootleggers operate by having calls over the telephone for liquor and deliver it in an automobile. The efforts of the commonwealth by such means to impress the jury that she was a ''bootlegger'' were unrelenting. It would seem, as said in the case of People v. Mullings, 83 Cal. 138, 23 P. 229, 231, 17 Am. St. Rep. 223, that ''the questions and not the answers were what the prosecution thought important.'' Especially is this true of the inquiry relative to the possession of this alleged still. This record is replete with efforts on the part of the commonwealth's attorney to get before the jury the impression that the appellant was a ''bootlegger'' and a woman of loose morals. The persistency with which such course was pursued was especially damaging to her, since, as the court points out in the case of Gale v. People, 26 Mich. 157, ''a list of questions which assume the existence of damaging facts, may be put in such a manner, and with such persistency and show of proof, as to impress a jury that there must be something wrong even though the prisoner fully denies it, and there is no other evidence.''

This court has often recognized the prejudicial effect resulting from the improper asking of a question assuming the existence of such matters. In the case of Foure v. Commonwealth, 205 Ky. 62, 265 S. W. 443, 445, the court holds that to have asked the accused, while testifying as a witness in his own behalf, ''How many times have you been charged with selling liquor?'' notwithstanding objection being sustained, was prejudicial.

In his argument to the jury, the commonwealth's attorney said:

''Clarence Craine told you the truth, that she called Moco, when she could not keep him there with her faded charm, she called him back, and out of consideration for her, he turned back, at least to see what she wanted, and she fired from her room these two shots that killed the boy. * * *''

To that part of this statement where the jury is told. that Clarence Craine testified that the appellant called. to the decedent and he turned back the appellant objected. The witness Clarence Craine had made no such statement, yet the lower court overruled the objection. Examination of the subsequent argument of the commonwealth's attorney will disclose that at no time is it even intimated that the witness did not testify that the appellant called the decedent back when he reached the door. In addition, that fact is impressed upon the mind of the jury by reason of the court's having overruled appellant's objection to it. No doubt' the jury considered, as it was certainly authorized to do, the ruling. of the lower court as implying that the commonwealth's attorney was correctly quoting the testimony of the witness. The commonwealth's theory of the killing was embodied in such statement, that the decedent had reached the door before he was shot. In this statement the commonwealth's attorney tells the jury that the witness Clarence Crain said that the decedent had reached the door and was called by the appellant before the shots were fired.

Counsel for Mrs. Steele had objected to these things, but usually without success. If any one of these objectionable features stood alone in this record, we would. probably treat it as nonprejudicial, but we cannot say that of all of them taken together. We must consider their effect upon Mrs. Steele just as they fell upon her; we must consider their combined effect, for so they fell. We have been impressed by this which we have copied from brief filed by counsel for Mrs. Steele:

"Many years ago when I was a boy a story was told to me of a man who did so load his camel that when he put on the last straw it broke the camel's back.

"This story had almost passed out of my mind· until this case was tried, then it occurred to me that if proper defense had been made for the owner of this camel when the Society for the Prevention of Cruelty to Animals had him arrested and brought before the Justcie of the Peace of that ancient day, that he never would have been convicted, for he could have held up the wheat straw, and have had the Court examine it and having felt its weight easily have convinced the Squire that it was too

light and inconsiderable to have broken the camel's back.

"In like manner he could have induced the Squire to excuse him for having thrown on the rye straw, and so on with the oat straw, the barley straw, the millet straw, the timothy straw, the red-top straw, the one of foxtail grass, and so on through the entire list of grains and grasses. Thus could I show the judgment of the ancient Squire who condemned this owner for over-loading his camel was erroneous. The ancient Squire looked at the camel's load, not a straw at a time, but considered the straw toute ensemble, as the Frenchman says, that is, he looked at these straws as they affected the camel; that is, he considered them altogether and based his judgment upon the effect of the mass. The ancient Squire's opinion reflected the effect on the camel of all he had to bear at the moment of the 'peak-load.' "

In the case of James v. Commonwealth, 197 Ky. 577, 247 S. W. 945, 948, the court states this general rule to be:

"We have frequently held that, where a number of errors appeared in the record, none of which, singly and alone, would be sufficient to authorize a reversal, one would be ordered if, considering them in the aggregate, we were 'satisfied that the substantial rights of the defendant have been prejudiced thereby.' "

This general rule is again stated in the case of Jones v. Commonwealth, 191 Ky. 485, 231 S. W. 31, 35, as being:

"While, possibly, none of the errors hereinbefore recited, standing alone, would be sufficient to authorize a reversal of the judgment of conviction if defendant's guilt was clearly proven, we have often held that a number of them, each of which approaches close to the line of being sufficiently prejudicial, will combined authorize a reversal. * * * Subsection 7 of section 271 of the Criminal Code of Practice authorizes the granting of a new trial if 'from any other cause the court be of opinion that the defendant has not received a fair and impartial trial'; while section 340 of the same Code author-

izes this court to reverse a judgment of conviction when, 'upon consideration of the whole case, the court is satisfied that the substantial rights of the defendant have been prejudiced thereby.' ''

In the case of Neely v. Strong, 186 Ky. 540, 217 S. W. 898, we said a defendant was entitled to at least one tolerably fair trial. This woman has not had such, and the judgment is reversed.