## Thornsberry v. Commonwealth.

(Decided Nov. 9, 1934.)

CLAUDE P. STEPHENS and B. M. JAMES for appellant.

BAILEY P. WOOTTON, Attorney General, and DAVID C. WALLS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

John Thornsberry appeals from a judgment convicting him of manslaughter, and fixing his punishment at five years' imprisonment.

It is first insisted that the verdict is flagrantly against the evidence.

The homicide occurred during the 1933 primary election at the Spurlock schoolhouse, in Floyd county, and was the result of a fight between appellant and his two nephews, Bill Justice and Jeff Justice, on one side, and the deceased, Henry Wright, and his two sons, Ernest Wright and Burr Wright, on the other. Some time before the difficulty, and at a time when Henry Wright was not present, Ernest Wright and Bill Justice had a fist fight, and were separated by appellant, Jeff Justice, and others. After the fist fight Ernest and Burr Wright joined their father and the three proceeded to the voting place. At that time appellant and his nephews, Jeff Justice and Bill Justice, were standing near the schoolhouse. On reaching the schoolhouse Henry Wright engaged in a fight with Bill Justice. During the fight appellant cut Henry Wright with his knife, and Henry Wright died from his wounds. According to some of the witnesses, Henry Wright was fighting with his fists, and did not have steel knucks in his hand. According to other witnesses, including appellant, he was armed with steel knucks, and each of his nephews had a knife in his hand. If it had been made to appear by uncontradicted evidence that the deceased was armed with steel knucks, and was beating Bill Justice at the time he was cut, an entirely different situation would be presented; but, in view of the evidence to the effect that the deceased was not armed, but was fighting with his fists, the jury had the right to conclude from the evi-

dence that Bill Justice was not in such real or apparent danger of death or great bodily harm at the hands of the deceased or his son that appellant was justified in taking the life of the deceased. We therefore rule that the verdict is not flagrantly against the evidence.

Another ground urged for reversal is that appellant and others were required to state over appellant's objection that he and others were engaged in a poker game some time prior to the homicide. The record discloses that on the cross-examination and recross-examination of appellant the following occurred:

"Q. 12. What kind of cards were they playing? A. Poker, I thought.

"Q. 13. Who was up there on the hill playing poker? A. Bill Justice and me and Green Haywood and Gene Colyer.

"Q. 14. Was you playing?* * * A. I played a few cards. * * *

"Q. 31. Who was up there in that poker game? A. Gene Colyer; Green Haywood, and Bill Justice and myself.

"Q. 32. Was Bill Justice, your nephew, in the poker game also? A. He was up there.

"Q. 33. Who else was up on the hill there and engaged in playing poker with you? A. We was up on the hill there and I believe John Anderson was in the game too.

"Q. 34. Can you name anyone else besides John Anderson? A. There might have been more, but that is about all I remember of.

"Q. 35. Do you remember what the wager was that day that you played for?

"Hon. C. P. Stephens (of counsel for defendant): We object to that, Your Honor.

"The Court: I will sustain the objection, unless you can connect it up with this case in some way."

Also the following occurred when Bill Justice, appellant's nephew, was on the stand:

"Q. 13. How long did you and your Uncle John stay up there on the hill and engage in that poker game? A. About two and a half hours.

"Q. 14. And you was playing for money instead of liquor?

"The Court: I think he has already explained that. * * *

"Q. 18. While you and your Uncle John was up there on the hill playing poker, where was your brother, Jeff Justice, the other defendant, if you know? A. I don't know. * * *

"Q. 27. How long was it after you came off of the hill with your Uncle John from the poker game until you and Ernest Wright had the fist fight that you told Mr. Stephens about? A. As soon as I got to the voting house."

On the examination of John Anderson the following occurred:

"Q. 12. At the time you was playing cards up there on the hill with the defendant, John Thornsberry, tell the jury how many drinks of liquor, or how much liquor you and the defendant, John Thornsberry, and Bill Justice drank up there? A. I never drank any and I never seen none."

Again when Green Haywood was on the stand the following occurred:

"Q. 7. Was you in the crowd that was up there playing poker up there on the hill? A. Yes, sir. I was up there.

"Q. 8. Was you playing poker with the defendant, John Thornsberry? A. Yes, sir.

"Q. 9. Mr. Haywood, while you was up there on the hill playing poker with the defendant, John Thornsberry, tell the jury whether or not you saw him take more than two or three drinks of liquor, and if so, how much liquor was consumed by you and John Thornsberry and Bill Justice while you was up there on the hill? A. I guess there was a half gallon of liquor drank by all of us boys."

Evidence of separate and distinct offenses is not admissible to show the guilt of the accused unless necessary to establish identity, motive, intent, guilty knowledge, or be inseparably interwoven with relevant evidence of the crime charged, or the independent offenses were perpetrated to conceal or enable the accused to commit the one charged. Bullington v. Commonwealth, 193 Ky. 529, 236 S. W. 961, and, as pointed out in Brashear v. Commonwealth, 178 Ky. 492, 199 S. W. 21, the admission of such evidence is nearly always prejudicial. Here the gambling game had no connection what-

ever with the homicide. Neither deceased nor his sons participated in the game, or were present. As the evidence did not come within any of the exceptions to the rule, it should not have been admitted; and the case being a close one, and the fact that appellant had been engaged in the poker game having been emphasized and brought to the attention of the jury in every possible way, we conclude that the admission of the evidence was prejudicial.

Judgment reversed, and cause remanded for a new trial not inconsistent with this opinion.