## Kinder v. Commonwealth.

(Decided Oct. 1, 1935.)

HIRAM H. OWENS for appellant.

BAILEY P. WOOTTON, Attorney General, and RAY L. MURPHY, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE REES—Reversing.

John Kinder, John Bain, and Harvey Cain were jointly indicted for the murder of Grant Leddington, and on his separate trial Kinder was convicted of the crime of manslaughter and sentenced to a term of 21 years in the penitentiary. He first insists that the evi-

dence for the commonwealth was insufficient to authorize a submission of the case to the jury and that the trial court erred in overruling his motion for a peremptory instruction. Grant Leddington and Claude Leddington, brothers, 22 and 24 years of age, respectively, were killed at a filling station near Barbourville on September 1, 1934. Kinder has only one leg and is referred to in the record as "Peg" Kinder. Shortly after dark on the evening of the homicide he walked from his father's home to a nearby filling station and restaurant operated by Charles Etter, a colored man. Harvey Cain and John Bain were there, and soon left in a motortruck driven by Bain. Kinder ordered a sandwich and a soft drink, and while he was eating became engaged in an altercation with Claude Leddington. Grant Leddington was not present. Kinder threw a bottle at Leddington and struck him on the head or shoulder. Bystanders separated them and Leddington left, going toward his home a short distance away. Appellant claims that Claude Leddington said as he left, "I am going down the road and get my pistol and get even with you. You'd better be gone when I get back." Kinder remained in the restaurant a few minutes and then started down the road. He met Harvey Cain and John Bain traveling in the opposite direction in Bain's truck, and he returned with them to Etter's restaurant. In the meantime Claude Leddington, accompanied by his brother Grant, had returned to the restaurant. When the truck stopped one of the Leddingtons approached, and, according to one witness for the commonwealth, asked appellant for a match, whereupon the shooting commenced. He was unable to say who fired the first shot. When the shooting ceased Grant Leddington was lying near the rear of the truck dead, and Claude, who had walked around the front of the truck, was mortally wounded. Grant had been shot four times, and three of the bullets entered his back. Appellant testified that as he opened the door of the truck and stepped on the running board Claude Leddington appeared and shoved a pistol against him and snapped it saying, "Damn you, you didn't think I would come back." Appellant grabbed the pistol and while he and Claude were struggling for its possession a man walked around the rear of the truck and began firing. Appellant thereupon drew his pistol and fired several shots at the man near the rear

of the truck and then shot at Claude, who continued to snap his pistol. He admitted that he fired eight shots. Claude Leddington walked around the truck and sank down on the side of the road. There was proof that he dropped a holster and said that he had thrown away a pistol as it "had snapped and was no good." A pistol was found later a few feet from the scene of the shooting and there was proof that it had been snapped, but none of the shells had exploded. The testimony of several witnesses tended to support appellant's claim that the Leddingtons were the aggressors and that he shot in his necessary self-defense. However, there was some evidence from which the jury might reasonably conclude that appellant was the aggressor.

It was dark and none of the bystanders could see all that transpired. Clarence Lickliter testified that when he was preparing to assist others to take the wounded man to the hospital, appellant said, "Wait a minute. Don't take him anywhere, I am not ready. I done killed one God-damn-son-of-a-bitch and I will kill two or three more before it is over with." Beve Smith testified that while Claude Leddington was begging some one to take him to the hospital, a truck drove up and appellant said, "Wait, don't take him. That is my meat. Don't take him." There was other testimony to the same effect, tending to show animus on the part of the appellant. There was also testimony tending to show that the pistol which appellant claims was found near the scene of the shooting belonged to his codefendant, Bain. Viewed as a whole, the evidence, and inferences deducible therefrom, authorized a submission of the case to the jury.

The court permitted the commonwealth to prove that appellant and John Bain had an altercation with Bert Shelton more than an hour before the shooting, and that appellant struck Shelton. This altercation had no connection with the trouble between appellant and the Leddingtons and the admission of this evidence was error. The acts and conduct of the accused at the time of the commission of the homicide may be proved, and evidence of prior acts is admissible when such acts tend to establish motive or intention in him to commit the crime, but it is not proper to prove other offenses not in any way connected with the homicide and which could not have had any influence in its commission. In

addition, the commonwealth's attorney persisted in asking questions which tended to brand appellant as a dealer in illicit liquors. Some of these questions are as follows: "You go up there to this Etter joint, pretty often, colored joint?" "You go there every week don't you?" "Take anything there with you when you go there every week?" "Didn't you know you were going to the colored joint for the purpose of raising a racket with somebody, and didn't you do that?" "Didn't you call these colored friends, these colored fellows you sell the whiskey to, to go into a huddle or caucus and plant that holster there and place your defense right there?" "After you shot these fellows, didn't you walk in the restaurant and have more business with them?" "You was there with the colored folks selling whiskey to them?"

In Canterbury v. Commonwealth, 234 Ky. 268, 27 S. W. (2d) 946, it was said:

"It is not competent to ask a defendant questions whose only possible object is to arouse in the minds of the jury a suspicion that he has been guilty of other offenses than the one for which he is being tried."

In Steele v. Commonwealth, 252 Ky. 730, 68 S. W. (2d) 6, the judgment was reversed chiefly because of a line of questioning by the commonwealth's attorney very similar to that in the instant case. In Thornsberry v. Commonwealth, 256 Ky. 166, 75 S. W. (2d) 1079, 1080, the commonwealth's attorney persisted in asking questions concerning the defendant's participation in a poker game shortly before the homicide, and in reversing the judgment the court said:

"Here the gambling game had no connection whatever with the homicide. Neither deceased nor his sons participated in the game, or were present. As the evidence did not come within any of the exceptions to the rule, it should not have been admitted; and the case being a close one, and the fact that appellant had been engaged in the poker game having been emphasized and brought to the attention of the jury in every possible way, we conclude that the admission of the evidence was prejudicial."

See, also, Maiden v. Commonwealth, 225 Ky. 671, 9 S.

538

W. (2d) 1018. The instant case is a close one on the facts, and we are unable to say that the incompetent evidence and the improper line of questioning referred to above did not have a prejudicial effect.

The judgment is reversed, with directions to grant appellant a new trial, and for further proceedings consistent herewith.